ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK




INTERNATIONAL HEALTHCARE EXCHANGE, INC., d/b/a GLOBAL HEALTHCARE EXCHANGE and KRISTIN M. CUENE,

Plaintiffs,

-v-

No. 02 Civ. 7862 (LTS)(THK)

GLOBAL HEALTHCARE EXCHANGE, LLC, ABBOTT LABORATORIES, BAXTER INTERNATIONAL, INC., GENERAL ELECTRIC COMPANY, JOHNSON & JOHNSON, MEDTRONIC, INC., GENE DORFF, JOHN F. GAITHER, JR., and PATRICK EGAN,

Defendants.

OPINION AND ORDER REGARDING TRADEMARK CLAIMS

Copies mailed provided to counsel
Chambers of Judge Swain 1.11.07

APPEARANCES:

AMSTER, ROTHSTEIN & EBENSTEIN
By: Anthony F. Lo Cicero, Esq.
Chester Rothstein, Esq.
Mark J. Rosenberg, Esq.
Karen J. Bernstein, Esq.
90 Park Avenue
New York, New York 10016

*Attorneys for Plaintiff*

SIDLEY AUSTIN BROWN & WOOD LLP
By: Laura H. Allen, Esq.
787 Seventh Avenue
New York, New York 10019
– and –
By: Richard O'Brien, Esq.
Julie O'Donnell Allen, Esq.
Debra J. Stanek, Esq.
10 S. Dearborn
Chicago, Illinois 60603

*Attorneys for Defendants Global Healthcare Exchange, LLC, Baxter International, Inc., General Electric Company, Medtronic, Inc., Gene Dorff, John F. Gaither, Jr. and Patrick Egan*

PATTERSON, BELKNAP, WEBB & TYLER LLP
By: Robert W. Lehrburger, Esq.
Sarah E. Zgliniec, Esq.
1133 Avenue of the Americas
New York, New York 10036

*Attorneys for Defendants Abbott Laboratories and Johnson & Johnson*

LAURA TAYLOR SWAIN, United States District Judge

This is a trademark infringement action arising from Plaintiff and Defendants' respective attempts to develop certain health care service companies. Before the Court is a motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment, filed by Defendants Global Healthcare Exchange, LLC, Abbott Laboratories, Baxter International, Inc., General Electric Company, Johnson & Johnson, and Medtronic, Inc. (collectively, "Defendants") with regard to their use of the marks "Global Healthcare Exchange" and "GHX." Plaintiff International Healthcare, Inc., d/b/a Global Healthcare Exchange ("Plaintiff") asserts that Defendants' use of the marks constitutes trademark infringement and unfair competition under federal law pursuant to 15 U.S.C. §§1114 and 1125, and under New York state common law.[1]

The Court has jurisdiction of the federal claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and of the state claims pursuant to 28 U.S.C. §§ 1367 and 1338(b).

## BACKGROUND[2]

Kristin Cuene ("Cuene") founded Plaintiff International Healthcare ("IHE") in December 1997 to develop, promote and commercialize the use of Internet-based technology by health care providers. (Pl's First Am. Compl. ¶ 24.) Cuene, the Chief Executive Officer and President of IHE, believed that the providers were unable to understand the need for Internet-

---

1 The Complaint in this action was filed by two entities, International Healthcare Exchange (IHE) and Kristin Cuene, but only Plaintiff IHE asserts the trademark infringement and unfair competition claims at issue in the instant motion.

2 The material facts summarized below are undisputed except as otherwise noted.

based technology without first understanding the implications of the Internet for the health care industry. (Dep. of Kristin M. Cuene, ("Cuene Dep.") 116.) Therefore, IHE spent two years educating health care providers about the Internet, determining the providers' technological needs, and using this research to inform the development of technological products and services that IHE hoped to commercialize. (Id. 116, 124-25.)

Following this business model, IHE began conducting presentations, lectures and seminars for members of the health care industry in or around December 1998, when IHE adopted the name Global Healthcare Exchange and the acronym GHEX in place of the name International Healthcare Exchange. (Pl's Opp'n to Defs' 56.1 Stmt. ("Pl's Opp'n") ¶¶ 39-40.) IHE alleges that it made a total of eight to ten presentations that focused on educating and informing health care industry members about opportunities for using the Internet to make better purchasing decisions and to reduce the time and costs associated with making purchases. (Pl's Mem. of Law 2; Pl's Opp'n ¶¶ 39-44.) IHE obtained the information it presented through analyzing industry trends and accumulating expert opinions and insights. (Id. 117.) Several of these presentations were made in response to unsolicited requests from industry members. (Pl's Opp'n ¶ 43.) However, IHE never charged industry members for these presentations, nor did it plan to generate revenue from the presentations. (Cuene Dep. 117-118.) Instead, IHE viewed the presentations as a "loss leader" because its goal at the time was to prepare health care organizations for the products and services that it was in the process of developing. (Id.; Pl's Mem. of Law 2.) Thus, IHE never offered any products for sale. (Cuene Dep. 117.)

Nonetheless, IHE marketed its undeveloped products and services by demonstrating to potential clients a beta version of its website for submitting bids, by networking

in 1999 at monthly meetings of a trade group consisting primarily of purchasers of supplies for health care organizations, and by telephoning approximately thirty people in the health care industry to promote IHE. (Pl's Opp'n ¶ 10.) In addition, IHE mailed 125 holiday cards bearing its mark to health care industry members. (Id. ¶ 49.) Further publicity included an article in the September/October 1999, edition of *Healthcare Business*, an industry periodical, that mentioned IHE. (Id. ¶ 45.)

IHE sought funding from over fifty venture capital firms to enable it to further develop and market its Internet technology. (Id. ¶ 51.) IHE was unsuccessful in attracting capital, however, because it was unable to hire a chief executive officer with significant relevant work experience. (Id.) Therefore, IHE revised its business strategy by attempting to partner with or be acquired by entities with greater financial resources. (Id. ¶ 52.) These efforts continued through May 2000; in the interim, IHE reduced its marketing activities and ceased providing presentations, speeches, and seminars. (Id. ¶ 54.)

The formation of Defendant Global Healthcare Exchange ("GHX") was publicly announced on March 29, 2000, although GHX had yet to adopt a name for itself at that time. (Id. ¶ 56.) GHX offered services and products akin to those of IHE. (Id.) Namely, GHX would "facilitate the exchange of information related to buying, selling and distributing medical equipment, devices and health care products and related services worldwide, and also provide access to extensive clinical content." (Ex. E to Decl. of Richard J. O'Brien.) On March 30, 2000, Cuene telephoned GHX, in part to communicate her desire to partner with it. (Id. ¶ 58.) Cuene's interest was unreciprocated, however. (Pl's Mem. of Law 5). She then sought

employment with GHX and submitted to it her resume along with IHE's brochure, which bore the "Global Healthcare Exchange" mark. (Id. ¶ 60.)

On April 3, 2000, GHX ordered a trademark search for the term "Global Healthcare Exchange" and consequently learned of a letter submitted by Cuene to the editors of CFO Magazine in December 1999 identifying herself as President and CEO of Global Healthcare Exchange. (Id. ¶ 63.) Two days later, GHX received a private investigator's report revealing IHE's address and phone number, Internet domain name, and business abstract. (Id. ¶ 66.) GHX alleges that its attempts to contact IHE by telephone and visits to its address were unavailing. (Defs' Mem. of Law 5.) In late April 2000, Defendants formally adopted the mark "Global Healthcare Exchange" and the acronym "GHX." (Pl's Opp. ¶ 68.)

Cuene learned of GHX's use of the marks "Global Healthcare Exchange" and "GHX" when she interviewed for a position there in June 2000. (Id. ¶ 71.) Cuene contends that she started working at GHX on June 22, 2000, although she did not received an official offer of employment until July 14, 2000. (Id. ¶¶ 25-6.) The document included a clause reciting that Cuene would assign to GHX any rights IHE had to the mark "Global Healthcare Exchange" and was accompanied by a form of assignment document. (Id. ¶ 74.) Cuene did not execute the assignment document, however, and instead added a rider to the employment agreement stating that her acceptance was subject to review by her counsel. (Id. ¶ 75.) On September 19, 2000, after Cuene had worked at GHX for three months, Cuene's employment relationship with GHX ended. (Id. ¶ 35.) GHX later requested that Cuene "quit claim" to GHX any rights IHE had to the mark "Global Healthcare Exchange." (Id. ¶ 78.) Cuene never executed the assignment or any quit claim document.

IHE applied to register the "GHEX" and "Global Healthcare Exchange" marks on June 8, 2001, and commenced this lawsuit on November 14, 2002. (O'Brien Decl., Exs. O, P.)

DISCUSSION

Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A factual issue is genuine if it can reasonably be resolved in favor of either party," and "[a] fact is material if it can affect the outcome of the action based on the governing law." David v. N.Y.P.D. 42nd Precinct Warrant Squad, No. 02 Civ. 2581 (DC), 2004 WL 1878777, at *3 (S.D.N.Y. Aug. 23, 2004) (citing Anderson, 477 U.S. at 248, 250). Initially, the burden is on the moving party to "demonstrate the absence of any genuine issues of material fact." Harrison v. Potter, 323 F. Supp. 2d 593, 599 (S.D.N.Y. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the moving party satisfies its burden, the burden then "shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists." Am. Home Assurance v. Zim Jamaica, 296 F. Supp. 2d 494, 498-99 (S.D.N.Y. 2003). The Court must also grant summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In resolving a motion for summary judgment, "the Court must view the evidence in a light that is favorable to the non-moving party and draw all reasonable inferences in favor of that party." Harrison, 323 F. Supp. 2d at 599 (citing Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004)).

The Trademark Infringement and Unfair Competition Claims

Counts Four and Five of IHE's Complaint assert federal Lanham Act causes of action for infringement of a registered trademark, under 15 U.S.C. § 1114, and unfair competition, under 15 U.S.C. § 1125(a), respectively. Count Six of the Complaint asserts New York state law claims of trademark infringement and unfair competition. Counts Four and Five can be treated for analytical purposes as one cause of action because there is no material difference in the governing law and Plaintiff relies on the same set of underlying facts. Menendez v. Saks and Co., 485 F.2d 1355, 1375 (2d Cir. 1973), rev'd on other grounds, 425 U.S. 682 (1976). Likewise, Count Six is subsumed under the same inquiry. See Pirone v. MacMillan, Inc., 894 F.2d 579, 582 (2d Cir. 1990) (requiring plaintiffs to establish same elements to prevail on a statutory or common law trademark infringement claim); Pfizer, Inc. v. Y2K Shipping & Trading, Inc., No. 00 CV 5204 (SJ), 2004 WL 896952, at *7 (E.D.N.Y. Mar. 26, 2004) ("The same analysis is used for common law trademark infringement and unfair competition cases as is used under federal law.").

To prevail on a Lanham Act infringement claim, a claimant must show that "it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." Morningside Group Ltd. v. Morningside Capital Group, 182 F.3d 133, 137 (2d Cir. 1999) (citation omitted). The Lanham Act provides in relevant part:

> Any person who in, on or in connection with any goods or services, . . . uses in commerce any word, term, symbol, or device, or any combination thereof, . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a) (West 2006).

"In the absence of federal registration [of a mark], prior ownership of a mark is only established as of the first *actual use* of a mark in a *genuine commercial transaction*." Allard Enterprise v. Advanced Programming Resources, 146 F.3d 350, 358 (6th Cir. 1998) (emphasis supplied); see also Mastercard Int'l, Inc., v. First Nat'l Bank of Omaha, Inc., Nos. 02 Civ. 3691 (DLC) and 03 Civ. 707(DLC), 2004 WL 326708, at *16 (S.D.N.Y. Feb. 23, 2004). The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127 (West 2006). "For purposes of this Act, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Id.

IHE's Provision of Services

Here, it is clear that IHE has not offered or sold goods at any time. Accordingly, the first inquiry is whether IHE provided a "service" within the meaning of the Lanham Act. Although the Act does not define the term "service," courts interpret it as "the performance of labor for the benefit of another." Morningside, 182 F.3d at 137; Murphy v. Provident Mut. Life Ins. Co., 923 F.2d 923, 927 (2d Cir. 1990). Services must be rendered to and in fact benefit others, regardless of the reasons motivating their provision. Morningside, 182 F.3d at 138. However, the "advertising of . . . service, as distinguished from service, may not [be treated as service under the Act]." Murphy, 923 F.2d at 927. Under the Act, a mark used in connection with the offer or sale of a service, as opposed to goods or products, is referred to as a "service mark." Id. at 926. The standards for protection of trade- and service marks are identical.[4] Id. at 927.

IHE has proffered sufficient evidence from which a reasonable factfinder could conclude that its presentations, lectures and seminars constituted services within the meaning of the Lanham Act, as opposed to mere educational or informational efforts in connection with possible future activities of IHE. IHE has offered evidence of the impact of the internet on the health care industry and of IHE's investment of time and efforts in obtaining the information presented. IHE's work in this connection included analyzing industry trends and accumulating

4 Although both parties use the term "trademark" throughout their briefs, because the relevant issue here involves the offer or provision of services to the health care industry, the mark in question is protectible only, if at all, as a service mark.

expert opinions and insights. A reasonable factfinder could also conclude that the presentations, lectures and seminars benefited the third parties to whom they were directed.[1]

Accordingly, the Court turns to the question of whether IHE's evidence is sufficient to support a finding of "use in commerce" of the Global Healthcare or GHEX marks in connection with its services.

"Use in Commerce" and Ownership Rights to the "Global Healthcare Exchange" Mark

"The right to a particular mark grows out of its use, not its mere adoption." United Drugs Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918). Rights to a service mark arise from "use in commerce" of the mark in connection with services. 15 U.S.C. § 1114; 15 U.S.C. § 1125. Use in commerce is determined "on a case by case basis, considering the totality of circumstances" surrounding the alleged use of the mark. Chere Amie v. Windstar Apparel, Corp., No. 01 Civ. 0040 (WHP), 2002 WL 460065, at *12 (S.D.N.Y. March 26, 2002). The Lanham Act defines use in commerce as the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "The 'talismanic test' is whether the mark was used 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" Housing & Servs., Inc. v. Minton, No. 97 Civ. 2725 (SHS), 1997 WL 349949, at *4 (S.D.N.Y. June 24, 1997) (internal citation omitted). This use must be "deliberate and continuous, not

[1] IHE has failed, however, to demonstrate that it ever provided or offered the information technology services that it was allegedly developing as the main focus of its business plan.

sporadic, casual, or transitory." La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271-72 (2d Cir. 1974).

Moreover, "there must be trade in the goods sold under the mark or at least an active and public attempt to establish such a trade." Id. at 1274. "Although evidence of sales is highly persuasive evidence of a trademark's commercial use, the 'existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein.'" Chere Amie, 2002 WL 460065, at *12-13. Indeed, "presale 'analogous use' of a mark, such as publicity 'in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications' . . . may be adequate to establish prior use in commerce." Housing, 1997 WL 349949, at *11. "[S]uch 'analogous use' of a mark 'has consistently been held sufficient . . . to establish priority rights as against subsequent users of the same or similar marks,' as long as the use is 'open and notorious' or is 'of such a nature and extent that the [mark] has become popularized in the public mind.'" Id. at *12 (internal citations ommitted).

IHE's proffered evidence is insufficient to show use in commerce of its marks because the evidence demonstrates no deliberate and continuous actual or analogous use of the marks in the ordinary course of trade. The undisputed facts demonstrate that, over the two-year period in question, IHE's use of the marks in the provision of services was limited to a handful of presentations, seminars and lectures. This sort of minimal activity is insufficient to satisfy the "use" element of the test. See Momentum Luggage & Leisure Bags v. Jansport, Inc., No. 00 Civ. 7909 (DLC), 2001 WL 830667, at *7 (S.D.N.Y. July 23, 2001), aff'd, 45 Fed. Appx. 42 (2d Cir. 2002). In Momentum, the court examined the plaintiff's advertising, promotion, and sales and found that the plaintiff in that case never made deliberate and continuous use of its mark despite

the plaintiff having exhibited products at an industry trade show, advertised in a magazine, generated approximately $3,000 in sales over two years, and having been mentioned in two trade show journals. Id. at *6; see, e.g., Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1400 (3d Cir. 1985) (holding that gross sales of less than $5,000 to fewer than 50 customers were below the minimum threshold for market penetration) (cited in Momentum, 2001 WL 830667, at *7); LaSociete Anonyme, 495 F.2d at 1272 (holding that 89 sales in 20 years was not "the kind of bona fide use intended to afford a basis for trademark protection.").

Nor does IHE's evidence demonstrate use of the mark in the ordinary course of trade. It is undisputed that IHE never sought or generated revenue from the services it provided under the mark. Indeed, IHE represented that it never intended to generate revenue during its first two years of operations but, rather, intended to use the seminars as a "loss leader" to generate a market for services that had not yet been developed but would be offered in the future. IHE cites Allard Enterprise, 146 F.3d at 359 for the proposition that a business with unprofitable sales and limited publicity may nonetheless be deemed to engage in commercial use of a mark where that mark was used on at least one fax, at least one resume, and in numerous other solicitations. See id.; Pl's Mem. of Law 12. Unlike IHE's situation, however, Allard involved the use of a mark in connection with employment recruiting services that the defendant understood he "would be paid [for] if an employee was hired." Allard, 146 F.3d at 359.

IHE's promotional and advertising activities are also insufficient to support a finding of analogous use. Although Cuene networked at monthly meetings of a trade group, IHE was mentioned in one industry periodical, and IHE sent numerous holiday cards to health care industry contacts, IHE never paid for any print advertising. Without more extensive publicity,

IHE's use of the mark is insufficient to establish the requisite analogous use. See Momentum, 2001 WL 830667, at *6; see also Lucent Info. Mgmt. Inc v. Lucent Techs., Inc., 186 F.3d 311, 325 (3d Cir. 1999) (denying prior ownership in part because plaintiff made only one sale in three months and failed to invest in public advertising or expand beyond the initial business set-up, despite having announced its business services in 50 promotional letters and thirteen sales presentations); Housing Services, Inc., 1997 WL 349949, at *12 (finding continuous use where mark was used for almost ten years and plaintiff enjoyed substantial coverage in the print media, compelling court to find use of mark was "open and notorious").

Therefore, there is no genuine issue of material fact as to whether IHE's sales and promotional activities, evaluated separately or in their totality, constitute sufficient use in commerce. The Court finds that IHE has failed to proffer sufficient evidence to raise a genuine issue of material fact as to its ownership of protected rights in the mark. Accordingly, GHX's motion for partial summary judgment will be granted.

Attorneys' Fees

Defendants request attorneys' fees pursuant to 15 U.S.C. § 1117(a), asserting that IHE exhibited bad faith in pursuing a meritless claim. Under Section 1117(a), the Court may "in exceptional cases award reasonable attorney fees to the prevailing party." 15 U.S.C.A. § 1117(a) (West 2006). "In a suit under the Lanham Act, attorneys' fees should be awarded only . . . on evidence of fraud or bad faith." Gordon & Breach Science Publrs. S.A. v. American Inst. of

Physics, 166 F.3d 438, 439 (2d Cir. 1999). The Court finds insufficient evidence of such misconduct, and therefore Defendants' request for attorneys' fees is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment is granted on Plaintiff's trademark infringement and unfair competition claims, Counts Four, Five, and Six. Counts Four, Five and Six of the Complaint are, accordingly, dismissed.

SO ORDERED.

Date: New York, New York
January 11, 2007

LAURA TAYLOR SWAIN
United States District Judge